1  John S. Blackman, Bar No. 114654
   **FARBSTEIN & BLACKMAN**
2  411 Borel Avenue, Suite 425
   San Mateo, CA 94402-3518
3  Telephone: (650) 554-6200
   Fax: (650) 554-6240
4

5  Charles A. Hansen, Bar No. 76679
   Carl D. Ciochon, Bar No. 165963
6  **WENDEL, ROSEN, BLACK & DEAN LLP**
   1111 Broadway, 24th Floor
7  Oakland, California 94607-4036
   Telephone: (510) 834-6600
8  Fax: (510) 834-1928
   Email: cciochon@wendel.com
9
   Attorneys for Defendant
10 Mark Garibaldi

11

## UNITED STATES DISTRICT COURT

12

### NORTHERN DISTRICT OF CALIFORNIA

13

14

15  EDITH MACIAS, individually and on behalf of similarly situated individuals; HOTON DURAN; TIFFANY HUYNH; AURA MENDIETA; WILLIAM LABOY; MIGUEL ACOSTA; CRUZ ACOSTA, CUAUHTEMOC TORAL; and TERESA VILLEGAS, KAPIKA SALAMBUE and MARINA DURAN,

     Case No. C 07 3437 JSW

     **REPLY MEMORANDUM IN SUPPORT OF DEFENDANT GARIBALDI'S MOTION TO DISMISS**

     Date:     January 11, 2008
     Time:     9:00 a.m.
     Location: Courtroom 2, 17th Floor
     Before:   Hon. Jeffrey S. White

19              Plaintiffs,

20       vs.

21  THOMAS J. TOMANEK; and MARK GARIBALDI, individually and doing business as THE GARIBALDI COMPANY,

23              Defendants.

24

25

26

27

28

## I. INTRODUCTION

Reduced to its essence, Plaintiffs' RICO claim is as follows:

- Plaintiffs were presented with, and executed, standard form lease agreements which stated that the landlord (Garibaldi) would handle their security deposits in accordance with California law.

- Years later, after Plaintiffs had vacated their apartments, Garibaldi used the U.S. mails to send statements to some (but not all) of them accurately describing the disposition of their security deposits.

These allegations cannot sustain a RICO claim. While this motion is based on Plaintiffs' failure to plead three essential RICO elements (mail fraud, continuity, RICO injury), the most glaring flaw lies in the mail fraud allegations. Under Supreme Court and Ninth Circuit authority, Garibaldi's mailing of after the fact "dispositional" statements cannot support the mail fraud charge since they were made *after* the alleged scheme had already "reached fruition." *Kann v. United States*, 323 U.S. 88, 95 (1944); *United States v. Manarite*, 44 F.3d 1407 (9th Cir. 1995). Moreover, because the dispositional statements were mailed "under the imperative command of a duty imposed by state law," they are exempt from the reach of the federal mail fraud statute. *Parr v. United States*, 363 U.S. 370, 391 (1960)

It bears repeating that this is not a federal case. It is a state law dispute over the proper application of California Civil Code §1950.5. Plaintiffs have an adequate state law remedy. Their First Amended Complaint should be dismissed without leave to amend.

## II. STATEMENT OF ISSUES

This motion presents three issues:

1. Whether Plaintiffs have alleged actionable predicate acts of mail fraud;

2. Whether the allegation of four predicate acts occurring more than two years ago over a single three month, four day, time period establish a threat of ongoing conduct sufficient to satisfy RICO's "continuity" requirement; and,

3. Whether the FAC alleges that Plaintiffs have suffered cognizable "RICO injury."

## III.  ARGUMENT

**A.    Plaintiffs Have Not Alleged Actionable Predicate Acts of Mail Fraud.**

Plaintiffs raise two principal arguments in defense of their claim that after the fact "dispositional" mailings constitute predicate acts of mail fraud.  First, they cite *Schmuck v. United States*, 489 U.S. 705 (1989), for the proposition that "innocent" mailings made after the fact can give rise to mail fraud liability so long as the mailings were "contemplated" and "foreseeable." Plaintiffs' discussion of *Schmuck* is incomplete.  As discussed below, the body of cases defining the limits of mail fraud liability establish a general rule that "after the fact" mailings will *not* support a mail fraud charge.  While *Schmuck* recognizes an exception to this general rule, it is inapplicable here.

Second, Plaintiffs argue that the mailings need not have been false, they need only have been in furtherance of the scheme.  While this argument accurately reflects the law, it helps Plaintiffs not at all, since the mailing of dispositional statements was not in furtherance of the alleged scheme to defraud.  Moreover, because the mailings were expressly mandated by California Civil Code §1950.5(g), they cannot give rise to federal mail fraud liability.

**1.    The mailing of dispositional "after the fact" statements was not in furtherance of the alleged scheme to defraud.**

"The federal mail fraud statute does not purport to reach all frauds, but only those limited instances in which the use of the mails is a part of the execution of the fraud, leaving all other cases to be dealt with by appropriate state law." *Kann v. United States*, 323 U.S. 88, 95 (1944). This case presents the question whether the mailing of statements accurately describing the disposition of tenants' security deposits pursuant to Civil Code §1950.5(g)(1) can be "part of the execution of the fraud."  Because the mailings here at issue occurred *after* Garibaldi had gained final possession of the tenants' security deposits, that question must be answered "no."

**a.    The applicable legal framework.**

A series of United States Supreme Court decisions addresses the applicability of the mail fraud statute to mailings that were made after the scheme's objective had been achieved.  The general rule, laid down in *Kann, Parr v. United States*, 363 U.S. 370 (1960), and *United States v.*

1  *Maze*, 414 U.S. 395 (1974), is that mailings which occur *after* the main object of the scheme has
2  been accomplished will not support a mail fraud charge.  In each of these cases, the Court
3  concluded that "after the fact" mailings were not material to execution of the fraud because "[t]he
4  scheme . . . had reached fruition.  The persons intended to receive the money had received it
5  irrevocably."  *Kann*, 323 U.S. at 94; *accord Maze*, 414 U.S. at 401 (Noting that "Respondent's
6  scheme reached fruition when he checked out of the motel."); *Parr* 363 U.S. at 393 ("Here, as in
7  *Kann*,'(t)he scheme in each case had reached fruition' when Carrillo and Garza received the
8  goods and services complained of.").

9  Two Supreme Court decisions recognize an exception to the general rule of nonliability
10  established by *Kann*, *Parr*, and *Maze*.  The first, *United States v. Sampson*, 371 U.S. 75 (1960),
11  holds that where mailings are designed to "lull the victim" by falsely promising performance,
12  they may be incident to the scheme even if they occur after defendant has already taken the
13  victim's money.  *Sampson*, 371 U.S. at 78 (district court erred in dismissing indictment which
14  alleged that mailings were made "for the purpose of lulling said victims by representing that their
15  applications had been accepted and that the defendants would therefore perform for said victims
16  the valuable services which the defendants had falsely and fraudulently represented that they
17  would perform.").

18  The second Supreme Court decision, *Schmuck v. United States*, 489 U.S. 705 (1989), is
19  the one on which Plaintiffs place primary reliance.  In *Schmuck*, the defendant engaged in a
20  scheme to sell used cars with odometers that had been rolled back, and was charged with mail
21  fraud based on mailings of title registration forms to the purchaser.  These mailings occurred after
22  the main objective of the fraud – sale of the cars – had already been accomplished.  The Court
23  nonetheless upheld defendant's conviction.  It reasoned that "[t]he mailing of the title-registration
24  forms was an essential step in the successful passage of title to the retail purchasers. . . . [A]
25  failure of this passage of title would have jeopardized Schmuck's relationship of trust and
26  goodwill with the retail dealers upon whose unwitting cooperation his scheme depended."  489
27  U.S. at 714.  Key to the Court's analysis was the fact that the scheme in question was large-scale
28  and involved repeated sales to the same used car dealers:

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, CA  94607-4036

> Evidence at trial indicated that Schmuck had employed a man known only as "Fred" to turn back the odometers on about 150 different cars. Schmuck then marketed these cars to a number of dealers, several of whom he dealt with on a consistent basis over a period of about 15 years. Indeed, of the 12 automobiles that are the subject of the counts of the indictment, 5 were sold to "P and A Sales," and 4 to "Southside Auto." *Thus, Schmuck's was not a "one-shot" operation in which he sold a single car to an isolated dealer.* His was an ongoing fraudulent venture. *A rational jury could have concluded that the success of Schmuck's venture depended upon his continued harmonious relations with, and good reputation among, retail dealers*, which in turn required the smooth flow of cars from the dealers to their Wisconsin customers.

*Id.* at 711-12 (emphasis added; internal citations omitted). The mailings were held incident to execution of the scheme because "Schmuck's scheme would have come to an abrupt halt if the dealers either had lost faith in Schmuck or had not been able to resell the cars obtained from him. . . . Thus, although the registration-form mailings may not have contributed directly to the duping of either the retail dealers or the customers, they were necessary to the passage of title, which in turn was essential to the perpetuation of Schmuck's scheme." *Id.* at 712.

Plaintiffs suggest that *Schmuck* creates a broad rule of liability for mailings so long as they are "contemplated" and "foreseeable." This suggestion is erroneous. The general rule remains as stated by *Kann*, *Parr*, and *Maze*: mailings made after the scheme had "reached fruition" will not give rise to mail fraud liability.[1] As the Fifth Circuit explained in *United States v. Strong*, 371 F.3d 225 (5th Cir. 2004):

> Synthesizing the Supreme Court's holding in *Schmuck* with these other precedents – which the Court accepted – and in *breaking* down *Schmuck* 's rationale, it is clear that the Court's statement that a mailing need merely be "incident to an essential part of the scheme" to satisfy the mail fraud statute, is cabined by the materiality of the mailing, as well as its timing: A tangential mailing occurring after the success of a fraud scheme is complete would never qualify, even if the mailing is "incidental" to a part of the scheme.

*Strong*, 371 F.3d at 229. *See also United States v. Evans*, 148 F.3d 477, 483 (5th Cir. 1998) ("[T]he aim of the scheme constituted defrauding the state of its right to Evans's honest and faithful services for the purpose of assisting Clay in violating conditions of parole. The mailing

---

1. Indeed, the exceptions established by *Sampson* and *Schmuck* were expressly foreshadowed by *Kann*, where the Court explained that, "to be distinguished are cases where the use of the mails is a means of concealment so that further frauds which are part of the scheme may be perpetrated." *Kann*, 323 U.S. at 94. Neither *Schmuck* nor *Sampson* changed the rules of the game; to suggest otherwise is to ignore the path of the law. For this reason, *Garrick-Aug Associates Store Leasing, Inc. v. Hirschfeld*, 652 F.Supp. 905 (S.D.N.Y. 1986), dismissed by Plaintiffs as having been overruled by *Schmuck*, in fact remains good law.

of the travel vouchers did not serve that goal because Evans had cleared the final hurdle when her supervisor approved her submitted travel vouchers."); *United States v. Cardall*, 885 F.2d 656 (10th Cir. 1989) ("Unlike the situation in *Schmuck*, the BLM mailing in this case was not necessary in maintaining the ongoing viability of defendant's fraud, either directly or indirectly. . . . The scheme had 'reached fruition' at the point that defendants acquired undertaker funds through misrepresentation; we hold that the BLM's use of the mail to notify defendants of the bid award was not 'for the purpose of executing the scheme.' Consequently, we reverse defendants' convictions on Count 21.").

Ninth Circuit authority expressly recognizes the distinction between after the facts mailing that are material and those that are not. Only where the mailings are intended either to "lull the victim" into a false sense of security or to protect an ongoing scheme from detection, may they be incident to execution of the scheme and thus constitute mail fraud. *Compare United States v. Manarite*, 44 F.3d 1407, 1413 (9th Cir. 1995) (reversing mail fraud convictions where after the fact mailings "were clearly not part of any kind of lulling scheme") *with United States v. Lo*, 231 F.3d 471, 479 (9th Cir. 2000) (upholding mail fraud conviction where after the fact mailings could have served to "lull the victims . . . into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely."). The Ninth Circuit's conclusion in *Manarite* is instructive: "Although the evidence shows 'that (a) there was a scheme to defraud, (b) [the defendants] were involved, and (c) a mailing occurred,' that is not enough to convict the Manarites absent proof that the 'mailing was in furtherance of the scheme to defraud.'" *Manarite*, 44 F.3d at 1413.

**b.    Garibaldi's mailings were not in furtherance of the scheme; they contravened it.**

Applying these rules to the facts of this case leads to the conclusion that Garibaldi's mailing of dispositional statements falls within the general rule of nonliability established by *Kann*, *Parr*, and *Maze* – not the exception recognized in *Sampson* and *Schmuck*. By definition, the dispositional statement required under Civil Code §1950.5 can *only* be made once the landlord has made a final "disposition" of the tenant's security deposit. The statute does not contemplate a

description of what the landlord is *planning* to do, it requires that the landlord describe "the basis for, and the amount of" the "disposition" that has *already been made*. *See* Cal. Civ. Code §1950.5(g)(1); *Black's Law Dictionary* (6th ed. 1990) (defining disposition as "[t]he final settlement of a matter").[2] Accordingly, by the time the statement was mailed, the alleged scheme had already "reached fruition."

Nor were Garibaldi's mailings likely to "lull" the tenants into a false sense of security. To the contrary, the mailing of dispositional statements placed the tenants on notice that their deposits had been withheld. The mailings were not in furtherance of the scheme, they contravened it. *See Manarite*, 44 F.3d at 1413 ("The prospective mailings and phone calls were clearly not part of any kind of lulling scheme. They would not assure the victim that all is well; rather, they would have exposed the credit scam and increased the likelihood of the Manarites' apprehension."); *Strong*, 371 F.3d at 231 ("The mailings at issue here . . . do not qualify as 'lulling' letters because the record contains no evidence that they do lull the victims of the fraud, the auction dealers and innocent purchasers. Indeed, the mailings, by introducing a secondary chain of title into state records, are more likely to alert an investigator to the fraud than to somehow delay its detection.").

Nor were the mailings necessary to prevent detection of "an ongoing fraudulent venture" as was the case in *Schmuck*. Key to the Court's holding in that case was the fact that the scheme involved numerous repeated sales to the *same* used car buyers. *See Schmuck*, 489 U.S. at 711-12. By contrast, this case presents the classic example of a series of "one-shot" operations, since each tenant could only be "defrauded" once. *Accord Strong*, 371 F.3d at 229 (question is whether scheme was "an 'ongoing fraudulent venture' that relied on third parties' continuing confidence and good will after each incident of fraud" or "a series of one-shot operations in which the scheme was successfully complete" with the close of each transaction).

---

2. Plaintiffs assert, without citation to any law or evidence, that "Defendant could legally make no claim against the security deposit or demand additional funds unless the security deposit statement was mailed to the vacating tenant." Plaintiffs' Opp., at 9:7-9. This assertion is flatly inconsistent with Civil Code §1950.5. The statement required by law is one of "disposition," not of "intent to make a claim."

This case most resembles *United States v. Cross*, 128 F.3d 145 (3d Cir. 1997). *Cross* involved an alleged scheme to "fix" traffic tickets. The prosecution alleged that defendants had used the mails to transmit notices of "case dispositions" to parties and the Pennsylvania Department of Transportation. The Third Circuit reversed defendants mail fraud convictions on the ground the mailing of dispositional notices was not in furtherance of the scheme:

> [B]y the time notices of dispositions were dispatched, the conspiracy had either succeeded or failed, the legal consequences of an acquittal or conviction had been established, and the routine reporting of the dispositions simply was not a part of the conspirators' execution of their scheme. Nor did that routine reporting have the effect of lulling anyone into a false sense of security or otherwise making the conspirators' apprehension less likely.

*Cross*, 128 F.3d at 151-52. The same conclusion holds here.[3]

### 2. Because the mailings were "compelled by law," they cannot give rise to mail fraud liability.

As Plaintiffs specifically allege, the mailings at issue in this case were made pursuant to California Civil Code §1950.5(g). *See* FAC, ¶71(b), (e), (h). In *Parr*, the Supreme Court expressly held that mailings made "under the imperative command of a duty imposed by state law" cannot give rise to mail fraud liability:

> [W]e must conclude that the legally compelled mailings, complained of in the first 16 counts of the indictment, were not shown to have been unlawful "step(s) in a plot," "part(s) of the execution of the fraud," "incident to an essential part of the scheme," or to have been made "for the purpose of executing such scheme," within the meaning of §1341, for we think it cannot be said that mailings made or caused to be made under the imperative command of duty imposed by state law are criminal under the federal mail fraud statute . . . ."

*Parr*, 360 U.S. at 391 (internal citations omitted). As the Third Circuit explained in *Cross*, "[t]he Supreme Court has clearly held that legally required mailings in circumstances like those in this case cannot be deemed to have been made 'for the purpose of executing' a fraudulent scheme." *Cross*, 128 F.3d at 152.

---

3. Plaintiffs also cite *Moses v. Martin*, 360 F. Supp. 2d 533 (S.D.N.Y. 2004) and *Adee Motor Cars, LLC v. Amato*, 388 F. Supp. 2d 250 (S.D.N.Y. 2005) as supporting their position. In *Moses*, the mailing of invoices directly furthered the scheme to defraud: "sending the invoices to plaintiff's clients enabled defendants to successfully steal plaintiff's money." *Moses*, 360 F. Supp. 2d at 548. And in *Adee Motor Cars*, the Court granted defendants motion for summary judgment (and dismissed plaintiff's supplemental state law claims) because there was no evidence *any* fraud had actually occurred. *Adee Motor Cars*, 388 F. Supp. 2d at 254-55.

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, CA 94607-4036

014499.0002\830945.2    *Reply Memorandum in Support of Defendant Garibaldi's Motion to Dismiss - Case No. C 07 3437 JSW*    - 7 -

### B. Plaintiff's "Continuity" Allegations Are Insufficient to Establish a "Pattern" of Racketeering Activity.

The FAC identifies four alleged instances of mail fraud, each of which occurred more than two years ago, over a single three month, four day period. In response to Garibaldi's assertion that these allegations do not satisfy RICO's "continuity" requirement, Plaintiffs raise three arguments.

First, Plaintiffs argue that the relevant time period should be expanded backwards to the date each tenant executed a lease agreement. This argument, that the "predicate act" should be defined to include a standard form lease representation, highlights the contrived nature of Plaintiffs' RICO claim. Under Plaintiffs' theory, every time Garibaldi entered into a lease with a new tenant, it committed a predicate act of mail fraud. That is not the law. The predicate act of mail fraud occurs when the U.S. mails are used. *U.S. v. Kennedy*, 64 F.3d 1465, 1476 (10th Cir.1995) ("The statute clearly contemplates a separate mail fraud count each time the mail is used to help execute the fraudulent scheme – not each time a misrepresentation is made."). In this case, the mails are alleged to have been used on four instances between August 9 and November 13, 2005.

Second, Plaintiffs argue that *unpleaded* acts of mailing should be counted, and that if they are the predicate acts "likely will extend back to December 2001 and forward to April 2006." Plaintiffs' Opp. at 13:14-15. Fraud must be pleaded with specificity. **Fed.R.Civ.Pro.** 9(b). Garibaldi respectfully submits that Plaintiffs' unpleaded, nonspecific allegations are insufficient to support their RICO claim.

Finally, relying on *Allwaste, Inc. v. Hecht*, 65 F.3d 1523 (9th Cir. 1995), Plaintiffs assert that their allegations show a likelihood of "ongoing" fraudulent activity sufficient to establish "open-ended" continuity. As an initial matter, *Hecht* did not hold plaintiffs sufficient to withstand a motion to dismiss; rather, it held that leave to amend was wrongly denied. See *Hecht*, 65 F.3d at 1531 ("The district court, applying legal standards consistent with this opinion, should consider whether to grant Allwaste leave to amend its complaint."). More significantly, *Hecht* involved a clear pattern of an ongoing kickback scheme, manifested in multiple unlawful acts

over a period of some thirteen months. As the Court explained:

> Allwaste alleged that Hecht and Henebury were involved in demanding four kickbacks (from Golden State Glass Recycling, Sierra West, A & A Recycling, and a Circo real estate agent), distributing and reinvesting the proceeds, and falsifying transportation reports. Because these activities were made possible by Hecht's and Henebury's employment status, were directed at a variety of Allwaste suppliers, and were not connected to the consummation of any particular transaction . . . .

*Hecht*, 65 F.3d at 1529. This case involves no similar pattern of unlawful conduct. Plaintiffs allege a mere four mailings, all of which occurred more than two years ago, and none of which is alleged in and of itself to be false or misleading in any respect. Plaintiffs allegations do not establish a likelihood of ongoing unlawful activity.

**C.     "RICO Injury" is A Separate Jurisdictional Requirement.**

To establish "RICO injury" a plaintiff must allege it was injured "by reason of" the pattern of racketeering activity. *Holmes v. Securities Investor Protection Corporation*, 503 U.S. 258, 265 (1992). As we noted in our opening brief, the Ninth Circuit (unlike other circuits) has not expressly required that a RICO plaintiff allege that it relied on the mailing in order to establish RICO injury. *Cf. American Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 233 (4th Cir. 2004) ("To recover civil RICO damages . . . an individual must also allege that he was injured 'by reason of' the pattern of racketeering activity. To meet this burden with respect to mail fraud and wire fraud, a plaintiff must 'plausibly allege both that [he] detrimentally relied in some way on the fraudulent mailing [or wire] ... and that the mailing [or wire] was a proximate cause of the alleged injury to [his] business or property.'"). Nonetheless, the RICO injury requirement incorporates common law principles of proximate cause into the RICO analysis; as such, it stands, at bottom, as a policy-based limitation on RICO's scope. *See Holmes*, 503 U.S. at 268 ("Here we use 'proximate cause' to label generically the judicial tools used to limit a person's responsibility for the consequences of that person's own acts.").

In this case, Plaintiffs allege that Garibaldi provided them with standard form leases which falsely represented their security deposits would be handled in accordance with California law. Years later, they received via the U.S. mail legally required statements which accurately described the disposition of their security deposits. The link between Plaintiffs' alleged injury

(parting with security deposit) and the predicate act purportedly giving rise to RICO jurisdiction (mailing of statements) is simply too attenuated to satisfy the requirement that Plaintiffs allege RICO injury.

## IV.  CONCLUSION

In *Miller v. Yokohama Tire Co.*, 358 F.3d 616 (9th Cir. 2004), the Ninth Circuit faced a similarly contrived RICO claim based on defendants' alleged failure to comply with California's wage and hour laws.  Like Plaintiffs here, Miller alleged that an innocent use of the U.S. mails (in that case, the mailing of pay stubs and W-2s) created "predicate acts" of mail fraud.  The Court affirmed the district court's dismissal of Miller's complaint without leave to amend, explaining: "We decline to expand RICO's reach to transform the federal courts into a general venue for ordinary state wage disputes." *Miller*, 358 F.3d at 618.  Garibaldi respectfully submits that this Court should likewise decline Plaintiffs' invitation to transform the federal courts into a general venue for ordinary landlord-tenant disputes.

Dated: November 26, 2007                     WENDEL, ROSEN, BLACK & DEAN LLP


By: */s/ Carl D. Ciochon*
    Carl D. Ciochon
    Attorneys for Defendant
    Mark Garibaldi